UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

STEVEN BELLA PEREZ,

                   Petitioner,

        v.

R. LOPEZ, Warden,

                Respondent.

_____

Case No. EDCV 11-0053-JEM

MEMORANDUM OPINION AND ORDER
DENYING PETITION FOR WRIT OF
HABEAS CORPUS

**PROCEEDINGS**

On January 6, 2011, Steven Bella Perez ("Petitioner"), a prisoner in state custody, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2254 ("Petition"). On April 4, 2011, Warden R. Lopez ("Respondent") filed an Answer. On July 11, 2011, Petitioner filed a Traverse. The parties have consented to proceed before the Magistrate Judge.

The matter is ready for decision. For the reasons set forth below, the Court concludes that the Petition should be denied and the case dismissed with prejudice.

**BACKGROUND**

On September 25, 2006, a Riverside County Superior Court jury found Petitioner guilty of transportation of heroin (Cal. Health & Saf. Code § 11352(a)), possession of heroin

1    with intent to sell (Cal. Health & Saf. Code § 11351), being a felon in possession of a firearm

2    (Cal. Penal Code § 12021(a)(1)), and being a felon in possession of ammunition (Cal. Penal

3    Code § 12316(b)(1)).  (Respondent's Lodged Document ("LD") 1, Clerk's Transcript ("CT")

4    154, 156, 158, 159.)  The jury found that Petitioner was personally armed with a firearm

5    during the commission of the drug offenses.  (CT 155, 157.)  On February 23, 2007,

6    Petitioner admitted that he had sustained nine prior convictions within the meaning of

7    California's Three Strikes Law (Cal. Penal Code § 667(c) &(e)(20) (A), § 1170.12(c)(2)(A))

8    and had served four prior prison terms (Cal. Penal Code § 667.5(b)).  (CT 181-82.)  On

9    February 1, 2008, the trial court sentenced Petitioner to state prison for a term of 32 years

10   to life.  (CT 257-58.)

11       Petitioner filed an appeal in the California Court of Appeal.  (LD 3-5.)  On March 19,

12   2009, the California Court of Appeal issued an unpublished decision affirming the judgment.

13   (LD 6.)  Petitioner filed a petition for review in the California Supreme Court.  (LD 7.)  On

14   June 10, 2009, the California Supreme Court summarily denied the petition for review.  (LD

15   8.)

16       Petitioner filed a petition for a writ of habeas corpus in the Riverside County Superior

17   Court.  (LD 9.)  On November 23, 2009, the Superior Court denied his petition for failure to

18   state a prima facie factual case.  (LD 10.)  Petitioner filed a petition for a writ of habeas

19   corpus in the California Court of Appeal.  (LD 11.)  On February 23, 2010, the Court of

20   Appeal summarily denied the petition.  (LD 12.)  Petitioner filed a petition for a writ of

21   habeas corpus in the California Supreme Court.  (LD 13.)  On October 27, 2010, the

22   California Supreme Court summarily denied the petition.  (LD 14.)

23                          **SUMMARY OF EVIDENCE AT TRIAL**

24       Based on its independent review of the record, the Court adopts the following factual

25   summary from the California Court of Appeal's unpublished opinion as a fair and accurate

26   summary of the evidence presented at trial:

27

28                                        2

On November 17, 2005, Riverside County Deputy Sheriff Sam Morovich was on patrol in Perris, California when he drove by a house and saw an unfamiliar car (Firebird) stopped at the home.  The deputy was familiar with the house because he had previously made and assisted in felony arrests at that location. [Petitioner] was sitting in the car conversing with a man standing beside the car.  As the deputy drove by, he observed there was no front license plate on the car.  When the vehicle drove off, the deputy turned around and followed the car.  The deputy stopped the car a short distance away.

When Deputy Morovich asked [Petitioner] for his driver's license, [Petitioner] stated his license had been suspended.  After the deputy verified the suspension with dispatch, [Petitioner] was detained for driving without a license.  In a patdown search of [Petitioner], the deputy found a large amount of cash in [Petitioner]'s wallet.

After the deputy placed [Petitioner] in the back of his patrol unit, the deputy conducted an inventory search of the car and found more cash in the car, which, with the cash found in [Petitioner]'s wallet, totalled over $1,300.  A loaded revolver, bullets, two pieces of heroin, four syringes, a digital scale, a glass pipe, and a bottle cap with heroin[] residue in it were also found in the vehicle.  The car was registered to a Luis Gonzalez of Thermal, California.

Deputy Morovich showed the heroin and gun to [Petitioner], and asked [Petitioner] where he had obtained the items.  [Petitioner] had initially, "most likely," denied knowing the gun and drugs were in the car, but then [Petitioner] initiated the conversation by asking, "[H]ey, what if I told you where the items came from?"  Deputy Morovich speculated that [Petitioner] wanted something in return for his cooperation.  [Petitioner] gave the officer the identity of the owner of the car and stated the gun and heroin belonged to the owner.

[Petitioner] was upset and claimed that he had to stay out of jail to be with his dying father.  He also stated that he was selling the heroin because he needed the money to pay for his father's funeral.

Deputy Morovich drove [Petitioner] to the police station where he read [Petitioner] his constitutional rights pursuant to Miranda v. Arizona[, 384 U.S. 436 [1966]) (Miranda).  [Petitioner] waived those rights and agreed to speak with the deputy.  Deputy Morovich asked [Petitioner] about the source of the gun and heroin. [ Petitioner] said the car and the heroin came from two brothers who lived in Thermal, who sold the car to him, and admitted that he was going to sell the heroin to make money for his father's funeral.  [Petitioner] also admitted that he was a heroin user.

[Petitioner] continued to offer information to law enforcement.  Deputy Morovich contacted the Southwest Narcotics Task Force and Deputy Theodore Peterson, who was working as an undercover narcotics officer in November 2005, came to speak with [Petitioner] at the police station.[1] After speaking with [Petitioner], Deputy Peterson opined the information [Petitioner] provided was of no interest to his unit.  [Petitioner] appeared somber and disappointed but did not mention his dying father.  Deputy Peterson opined [Petitioner] was a user and dealer of heroin based on the amount of heroin found together with the gun, scale, money, and needles.

[Petitioner] testified that he had bought the Firebird from a friend in Thermal, to resell for a profit, about two weeks before his arrest.  The day he was arrested a woman had called him about the car and he drove to the location of the house where he encountered a man claiming the woman was not home.  He confirmed that he had been pulled over by Deputy Morovich

---

[1]      Both deputies omitted [Petitioner]'s offer to cooperate from their reports for [Petitioner]'s safety.

and informed the officer that his license was suspended.  He stated that he had followed the deputy's directives and in a brief conversation, the deputy had asked him who the gun and drugs belonged to.  [Petitioner] denied owning the gun or knowing it was in the car; he also denied the heroin belonged to him.

[Petitioner] further testified that on the drive to the police station Deputy Morovich said [Petitioner] could get a long time in prison and that [Petitioner] needed to say who owned the drugs.  [Petitioner] claimed that the deputy said the deputy could make [Petitioner]'s charges go away, "if [[Petitioner]] could tell [him] where the drugs came from, that he would allow [[Petitioner]] to be with [his] father."  [Petitioner] explained that it was "possible" he told the deputies about the drugs, but it was so important for him not to go to jail at that time, that he "might have said anything to keep [himself] out of jail"; he might even have lied to the deputies.  [Petitioner] agreed with the prosecutor that it was a total coincidence that there was heroin in the car and he was under the influence of heroin that day.  [Petitioner] admitted that he had used drugs in the past and also admitted to having a past criminal record.

[Petitioner]'s fiancée testified that she had seen about $1,500 in [Petitioner]'s wallet on the morning of his arrest and that [Petitioner] had visited his ailing father everyday in Perris.[2]  She believed that [Petitioner] was going to use the money for his father's funeral.

(LD 6 at 2-5.)

---

[2]      [Petitioner]'s father had passed away on December 8, 2005.  [Petitioner]'s fiancee admitted having previously been convicted of numerous theft-related felonies, including burglaries.

**PETITIONER'S CONTENTIONS**

1.      The trial court erred when it failed to exclude statements made by Petitioner during pre-Miranda questioning and statements he made shortly after receiving Miranda advisements.

2.      Petitioner's statements were involuntary.

3.      Petitioner was denied effective assistance of counsel because trial counsel failed to preserve the Miranda and voluntariness issues for appeal.

4.      The trial court's denial of Petitioner's motion to suppress violated his Fourth, Sixth and Fourteenth Amendment rights.

5.      Petitioner's Three Strikes sentence violates due process because his prior convictions involved negotiated plea agreements that specified the allowable future uses of the convictions.

6.      Petitioner's Three Strikes sentence violates the Eighth Amendment prohibition against cruel and unusual punishment.

7.      Trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, because she failed adequately to prepare for trial.

(Petition at 5-6, attached petition ("Attach.") at 5-7.)

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the Court's consideration of Petitioner's cognizable federal claims.  28 U.S.C. § 2254(d), as amended by AEDPA, states:

An application for a writ of habeas corpus on behalf of a person in custody

pursuant to the judgment of a State court shall not be granted with respect to

any claim that was adjudicated on the merits in State court proceedings unless

the adjudication of the claim – (1) resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or (2) resulted in a

1   decision that was based on an unreasonable determination of the facts in light

2   of the evidence presented in the State court proceeding.

3       In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court held

4   that a state court's decision can be contrary to federal law if it either (1) fails to apply the

5   correct controlling authority, or (2) applies the controlling authority to a case involving facts

6   materially indistinguishable from those in a controlling case, but nonetheless reaches a

7   different result. Id. at 405-06. A state court's decision can involve an unreasonable

8   application of federal law if it either (1) correctly identifies the governing rule but then applies

9   it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to

10  extend a clearly established legal principle to a new context in a way that is objectively

11  unreasonable. Id. at 407-08. The Supreme Court has admonished courts against equating

12  the term "unreasonable application" with "clear error." "These two standards . . . are not the

13  same. The gloss of clear error fails to give proper deference to state courts by conflating

14  error (even clear error) with unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 75

15  (2003). Instead, in this context, habeas relief may issue only if the state court's application

16  of federal law was "objectively unreasonable." Id. "A state court's determination that a

17  claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

18  disagree' on the correctness of the state court's decision." Harrington v. Richter, __ U.S.

19  __, __, 131 S. Ct. 770, 786 (2011).

20      Under AEDPA, the "clearly established Federal law" that controls federal habeas

21  review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court

22  decisions "as of the time of the relevant state-court decision." Williams, 529 U.S. at 412 ("§

23  2254(d)(i) restricts the source of clearly established law to this Court's jurisprudence");

24  Andrade, 531 U.S. at 71. If there is no Supreme Court precedent that controls a legal issue

25  raised by a habeas petitioner in state court, the state court's decision cannot be contrary to,

26  or an unreasonable application of, clearly established federal law. Wright v. Van Patten,

27  552 U.S. 120, 125-26 (2008) (per curiam); see also Carey v. Musladin, 549 U.S. 70, 76-77

28  (2006). A state court need not cite or even be aware of the controlling Supreme Court

1   cases, "so long as neither the reasoning nor the result of the state-court decision contradicts

2   them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see also Bell v. Cone, 543 U.S.

3   447, 455 (2005) (per curiam).

4          Petitioner raised Grounds One, Two and Three on direct appeal.  (LD 3.)  The

5   California Court of Appeal denied these claims in a reasoned decision and the California

6   Supreme Court denied them summarily.  (LD 6, 8.)  The Court looks through the California

7   Supreme Court's silent denial to the Court of Appeal's reasoned decision and reviews that

8   decision under the AEDPA standards.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); see

9   Gill v. Ayers, 342 F.3d 911, 917 n.5 (9th Cir. 2003) (the federal court looks through the

10  unexplained California Supreme Court decision to the last reasoned lower court decision to

11  determine the basis for the state court's judgment).

12        Petitioner presented Grounds Four through Seven to the state courts by habeas

13  petition and the state courts denied these claims summarily.  (LD 9-14.)  The AEDPA

14  standard applies even if no state court issued a decision explaining the reasons for its denial

15  of the federal claim.  Harrington, 131 S. Ct. at 784-85.  In the absence of a reasoned

16  decision, however, the federal court must independently review the record to determine

17  whether the state court was objectively unreasonable in its application of clearly established

18  federal law.  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011); Musladin v. Lamarque,

19  555 F.3d 830, 835 (9th Cir. 2009).

20  **DISCUSSION**

21  **I.**     **GROUND ONE DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

22        In Ground One, Petitioner contends that his statements to the police should have

23  been excluded from evidence because they were elicited in violation of Miranda.  He argues

24  that the trial court should have excluded the statements he made before receiving Miranda

25  advisements as well as the statements he made after the Miranda advisements, since these

26  were tainted by the prior Miranda violation.  (Petition at 5, Attach. at 9-14.)

27        As an initial matter, Petitioner did not object to the admission of his statements at trial

28  on Miranda grounds, as California law requires.  See People v. Seaton, 26 Cal.4th 598,

655-56 (2001) (defendant who did not object to evidence on <u>Miranda</u> grounds at trial could not raise <u>Miranda</u> issue on appeal); <u>People v. Mattson</u>, 50 Cal.3d  826, 853-54 (1990) (same).  For this reason, the California Court of Appeal found that Petitioner had failed to preserve his <u>Miranda</u> claim for appeal.  (LD 6 at 6-7.)  The California Court of Appeal nevertheless addressed the claim and found that it lacked merit.  (<u>Id.</u> at 7.)  For the reasons set forth below, the Court finds that the Court of Appeal reasonably applied <u>Miranda</u> and its progeny.[3]

  In <u>Miranda v. Arizona</u>, the United States Supreme Court declared that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statements he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed."  384 U.S. at 444.  "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial."  <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (per curiam). The <u>Miranda</u> safeguards come into play when a person in custody is subjected to either express questioning or its functional equivalent, *i.e.*, words or actions on the part of the police that they should know are reasonably likely to elicit an incriminating response.  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 309-01 (1980).

  The California Court of Appeal assumed, for the sake of argument, that Petitioner's pre-<u>Miranda</u> statements should have been excluded, and focused on his statements at the police station after he received his <u>Miranda</u> advisements.  (LD 6 at 8.)  The Court of Appeal relied on the Supreme Court's decision in <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985).  In <u>Elstad</u>,

---

[3] Respondent contends that Petitioner's <u>Miranda</u> claim is barred by California's contemporaneous objection rule.  (Answer at 10.)  <u>See</u> <u>Wainwright v. Sykes</u>, 433 U.S. 72, 86-87 (1977) (finding that <u>Miranda</u> claim was procedurally defaulted when defendant failed to object to admission of statement at trial).  The state courts, however, addressed the merits of Petitioner's <u>Miranda</u> claim despite noting his failure to preserve it for appeal.  Moreover, in the interests of judicial economy, federal habeas courts may address allegedly defaulted issues on the merits whenever the lack of merit is clear but the procedural default issues are not.  <u>Lambrix v. Singletary</u>, 520 U.S. 518, 523-25 (1997); <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002).  Thus, the Court has addressed the merits of the <u>Miranda</u> claim.

1  the suspect acknowledged, during a brief exchange with a police officer while he was being

2  arrested on a burglary charge, that he had been at the scene of the burglary.  At the police

3  station, the suspect was given his Miranda warnings and confessed.  Id. at 300-01.  The

4  Supreme Court stated that "absent deliberately coercive or improper tactics in obtaining the

5  initial statement," the mere fact that a suspect has made a pre-Miranda admission does not

6  necessarily mean that his waiver of his Miranda rights is not voluntary.  Id. at 314.  "A

7  subsequent administration of Miranda warnings to a suspect who has given a voluntary but

8  unwarned statement ordinarily should suffice to remove the conditions that precluded

9  admission of the earlier statement."  Id.  The Supreme Court held that "a suspect who has

10  once responded to unwarned yet uncoercive questioning is not thereby disabled from

11  waiving his rights and confessing after he has been given the requisite Miranda warnings."

12  Id. at 318.

13          Applying Elstad, the Court of Appeal stated:

14          Here, as in Elstad, [Petitioner]'s prior statements concerning the gun and

15          heroin, though obtained without Miranda warnings, were otherwise uncoerced.

16          The record shows that the questioning as to these items consisted of the sole

17          question of whether [Petitioner] knew where these items came from.  Deputy

18          Morovich asked [Petitioner] about the source of the gun and heroin.

19          [Petitioner] said the car and the heroin came from two brothers who lived in

20          Thermal, who sold the car to him, and admitted that he was going to sell the

21          heroin to make money for his father's funeral.  [Petitioner] also admitted that

22          he was a heroin user, and asked about providing information to the deputy to

23          get him out of custody.  Furthermore, [Petitioner] was given his Miranda

24          warnings prior to making these statements, and the record reasonably

25          supports the conclusion that he made a rational and intelligent choice to waive

26          his rights.  (Elstad, supra, 470 U.S. at p. 314.)  Contrary to [Petitioner]'s claim

27          that he simply had no choice but to say the drugs were his, the record

28          indicates that he freely waived his rights and voluntarily confessed to being a

1    heroin user and having knowledge of the gun and heroin.  Therefore, the court

2    properly admitted the statements.

3  (LD 6 at 10-11.)

4        The Court of Appeal rejected Petitioner's attempt to analogize his case to Missouri v.

5  Seibert, 542 U.S. 600 (2004).  (LD 6 at 11.)  In Seibert, the police deliberately withheld

6  Miranda warnings and questioned the defendant until she confessed; then the same officer

7  gave defendant her Miranda warnings and continued the interrogation, confronting her with

8  her pre-warning statements until she confessed again.  Seibert, 542 U.S. at 604-06.  A

9  plurality of the Supreme Court held that, under these circumstances, the Miranda warnings

10  were ineffective, because a reasonable person would not have understood them to convey

11  that she retained a choice about continuing to talk.[4]  Id. at 617.

12        The California Court of Appeal found that in this case, unlike in Seibert, "there was no

13  deliberate strategy to undermine Miranda," but only a simple failure to administer the

14  warnings, unaccompanied by any coercion.  (LD 6 at 12.)  The pre-Miranda questioning

15  involved only a single question -- whether Petitioner knew who the drugs and gun belonged

16  to -- in order to gather information at the time of investigating the scene, and the post-

17  Miranda questioning was not designed to get Petitioner to repeat the statements he had

18  made before the Miranda advisements, but to question him about what the deputies had

19  found during the search of the car.  (Id.)  The Court of Appeal concluded that the trial court

20  had properly admitted Petitioner's post-Miranda statement.  (Id.)

21

22

_____

23    [4]    In a concurring opinion in Seibert, Justice Kennedy opined that the plurality's conclusion that the
admissibility of the post-warning statements should depend on whether the mid-stream Miranda
24  warnings could have been effective enough to accomplish their object was too broad, and stated that
the admissibility of the post-warning statements should continue to be governed by Elstad unless the
25  two-step strategy was used deliberately.  Seibert, 542 U.S. at 621-22 (Kennedy, J., concurring).  That
was the case in Seibert, where the interrogating officer admitted that he consciously applied an
26  interrogation technique he had been taught: question first, then give the warnings, and then repeat the
questions until the suspect gives the pre-Miranda answers again.  Seibert, 542 U.S. at 605-06.  The
27  Ninth Circuit has concluded that Justice Kennedy's concurrence constitutes the holding in Seibert
because it constituted  the narrowest grounds with which the majority of the Court agreed.  United
28  States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006).

1    The Court concurs in the analysis and conclusion of the Court of Appeal.  Petitioner

2    was clearly in custody when Deputy Morovich asked him about the money, drugs and gun in

3    the car; he had been detained, handcuffed and placed in the patrol car.  (LD 2, 1 Reporter's

4    Transcript ("RT") 73-80, 106-15; 2 RT 293-96.)  He should have been given Miranda

5    warnings and his statements in the car were admitted in violation of Miranda.  However,

6    Petitioner did not make any particularly incriminating statements in the car and none that he

7    did not repeat after receiving his Miranda warnings.  The Court agrees with the Court of

8    Appeal's conclusion that Petitioner's post-Miranda statements were not tainted by the

9    Miranda violation: the pre-Miranda questioning was extremely brief, there were no

10   circumstances suggesting coercion, and the facts do not suggest that the deputies

11   deliberately used a two-step process to circumvent Miranda.  (1 RT 84-85, 115-18; 2 RT

12   291-94.)  The California Court of Appeal reasonably applied United States Supreme Court

13   precedent when it rejected Petitioner's Miranda claim.

14       Accordingly, the state court's rejection of this claim was not contrary to, or an

15   unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).

16   Ground One does not warrant federal habeas relief.

17   **II.    GROUND TWO DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

18       In Ground Two, Petitioner contends that his statements to the police were involuntary

19   because the deputies took advantage of his fragile emotional state and promised that he

20   could return home to his dying father after he answered their questions.  (Petition at 5;

21   Attach. at 15-20.)

22       The Fifth Amendment, which commands that no person "shall be compelled in any

23   criminal case to be a witness against himself," precludes the use of a confession that is not

24   voluntary.  Seibert, 542 U.S. at 607.  The Fourteenth Amendment secures the privilege

25   against self-incrimination against state invasion.  Id.; Malloy v. Hogan, 378 U.S. 1, 8 (1964).

26   In determining whether a confession was voluntary, the question is whether the defendant's

27   will was overborne at the time he confessed.  If so, the confession cannot be deemed the

28   product of a rational intellect and a free will.  Lynumn v. Illinois, 372 U.S. 528, 534 (1963).

1   Determining whether a defendant's will was overborne in a particular case involves

2   assessing "the totality of all the surrounding circumstances -- both the characteristics of the

3   accused and the details of the interrogation."  Schneckloth v. Bustamonte, 412 U.S. 218,

4   226 (1973).  The court must first determine if there was coercive police activity.  Colorado v.

5   Connelly, 479 U.S. 157, 167 (1986).  The court then must consider the effect that the totality

6   of the circumstances had upon the will of the suspect.  Schneckloth, 412 U.S. at 226-27.

7   "The test is whether, considering the totality of the circumstances, the government obtained

8   the statement by physical or psychological coercion or by improper inducement so that the

9   suspect's will was overborne."[5]  United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th

10  Cir. 1988).  If a promise was involved, it must be sufficiently compelling to overbear the

11  suspect's will in light of the circumstances.  Id.

12         The Court of Appeal found that Petitioner's statements were voluntary.  It stated:

13         There was no evidence of force, threats, or promises by the deputies.

14         [Petitioner] himself volunteered that his father was ill and that he would do

15         anything to avoid custody, including helping the police by providing information

16         about the heroin.  [Petitioner] had substantial prior experience with the criminal

17         justice system and there was no evidence to suggest that he was physically

18         vulnerable or impaired.  In addition, the interrogation was brief in duration.

19         Though [Petitioner] was upset about his father's illness, that was a preexisting

20         circumstance that was neither caused by nor exploited by the deputies here.

21         In addition, although [Petitioner] describes the deputies' statements as an offer

22         to "'make the charges go away,'" according to Deputy Morovich it was

23         [Petitioner] who had initiated the possibility of cooperation, going so far as to

24         give the deputy the name of another deputy [Petitioner] had worked for as an

25         informant in the past.  Deputy Peterson was contacted to give [Petitioner] an

26         opportunity to provide information that might have helped [Petitioner].  There

27  _____

28         [5]   However, the Supreme Court has cautioned that a confession made after Miranda warnings and a waiver will very rarely be found involuntary.  See Seibert, 542 U.S. at 608-09.

13

1    was no evidence that the deputies had induced [Petitioner]'s admissions

2    through coercive tactics, as [Petitioner] suggests.  Rather, [Petitioner]

3    voluntarily provided information in an effort to help himself out of his dilemma.

4    Based on the totality of the circumstances, [Petitioner]'s statement was

5    voluntarily made.

6    (LD 5 at 14-15.)

7    　　　The Court concurs in the Court of Appeal's analysis and conclusion.  Petitioner

8    contends that he was vulnerable to coercion because he was devastated at the prospect

9    that his detention would preclude him from being with his dying father in his last days.

10   (Petition, Attach. at 17; see 2 RT 294.)  However, the voluntariness inquiry is "not concerned

11   'with moral and psychological pressures to confess emanating from sources other than

12   official coercion.'"  Connelly, 479 U.S. at 170 (quoting Elstad, 470 U.S. at 305)).  Petitioner

13   contends that Deputy Morovich told him that he could be with his father if he provided

14   information regarding the source of the drugs, and that he understood from Deputy Petersen

15   that he could return home if he provided information.  (Petition, Attach. at 17; 2 RT 295,

16   311.)  Deputy Petersen testified at trial that he told Petitioner that he could talk to the district

17   attorney about a reduced sentence in exchange for information about the source of the

18   drugs, and conceded on cross-examination that sometimes arrangements with informants

19   involve release on one's own recognizance.  (1 RT 168-69.)  As long as it is unaccompanied

20   by threats or other coercive practices, an interrogating officer's promise to inform

21   prosecutors of cooperation and to recommend leniency does not render a subsequent

22   statement involuntary.  See Leon Guerrero, 847 F.2d at 1366 & n.2; see also United States

23   v. Okafor, 285 F.3d 842, 847 (9th Cir. 2002).  There were no threats or coercive practices

24   here, and the promises made by the deputies were not sufficiently compelling to overbear

25   Petitioner's will.  Leon Guerrero, 847 F.2d at 1366.  In fact, Deputy Morovich testified that it

26   was Petitioner who initiated the possibility of providing information, and Petitioner himself

27   testified that he was eager to provide the deputies with information in the hope of securing

28   his release.  (1 RT 91, 115-16; 2 RT 297.)  The California Court of Appeal reasonably found

1    that, under the totality of the circumstances, Petitioner's statements were made voluntarily.

2    See Schneckloth, 412 U.S. at 226-27.

3         Accordingly, the state court's rejection of this claim was not contrary to, or an

4    unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).

5    Ground Two does not warrant federal habeas relief.

6    **III.    GROUND THREE DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

7         In Ground Three, Petitioner contends that trial counsel rendered ineffective

8    assistance, in violation of the Sixth Amendment, because she failed to preserve the Miranda

9    and voluntariness issues raised in Grounds One and Two for appellate review.  (Petition at

10   6, Attach. at 20-23.)  Petitioner raised his ineffective assistance claim on direct appeal, and

11   the California Court of Appeal implicitly rejected it when it stated that it would address

12   Petitioner's Miranda claim on the merits "to avoid his ineffective assistance of counsel

13   argument."  (LD 6 at 7.)

14        **A.    Clearly Established Federal Law**

15        Review of Petitioner's ineffective assistance of counsel claims involves a two-step

16   analysis.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  First, Petitioner must

17   prove that his attorney's representation fell below an objective standard of reasonableness.

18   Id. at 687-88.  Second, Petitioner must show that he was prejudiced by counsel's deficient

19   performance.  Id. at 687.  Petitioner must prove both elements.  Id.  The Court may reject

20   his claims upon finding either that counsel's performance was reasonable or that the

21   claimed error was not prejudicial.  Id. at 697; see also Thomas v. Borg, 159 F.3d 1147,

22   1151-52 (9th Cir. 1998).

23        Moreover, courts generally maintain a "strong presumption that counsel's conduct

24   falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at

25   689.  Indeed, the Supreme Court dictates that "[j]udicial scrutiny of counsel's performance

26   must be highly deferential."  Id.  In order to show that his counsel's performance was

27   objectively unreasonable, Petitioner must overcome the strong presumption that the

28   challenged action might be considered sound trial strategy under the circumstances.  Id.  A

reasonable tactical decision by counsel with which the defendant disagrees cannot form a basis for an ineffective assistance of counsel claim. See id. at 690; Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984) (per curiam).  The Court does not consider whether another lawyer with the benefit of hindsight would have acted differently than Petitioner's trial counsel. Strickland, 466 U.S. at 689.  Instead, the Court looks only to whether Petitioner's trial counsel made errors so serious that counsel failed to function as guaranteed by the Sixth Amendment. Id. at 687.  In conducting this analysis, the Court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.

Assuming that Petitioner can show that his defense counsel's performance was unreasonable, the Court still must determine whether counsel's performance prejudiced Petitioner. See Strickland, 466 U.S. at 694.  A petitioner can prove prejudice by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id.  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id.  Thus, the petitioner will prevail only if he can prove that because of counsel's deficient performance, "the result of the proceeding was fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

**B.    The Court of Appeal Reasonably Rejected Petitioner's Claim**

To the extent Petitioner complains that trial counsel did not preserve the Miranda and voluntariness arguments for appeal, he has not shown prejudice because the Court of Appeal addressed and rejected the Miranda and voluntariness claims on the merits despite trial counsel's failure to raise them in the trial court.  (LD 6 at 7-15.)  To the extent Petitioner complains that trial counsel failed to seek suppression of the statements, he must show that the motion would have been meritorious and that there is a reasonable probability that the jury would have reached a different verdict if his statements had been suppressed.  Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1170 (9th Cir. 2003) (citing Kimmelman v. Morrison, 477

1    U.S. 365, 375 (1986)).  The Court's discussion of Grounds One and Two demonstrates that

2    there was no reasonable likelihood that the trial court would have granted a motion to

3    suppress Petitioner's post-<u>Miranda</u> statements, and that suppression of the pre-<u>Miranda</u>

4    statements would have had little impact on the overall evidence presented.  Moreover, there

5    was overwhelming evidence against Petitioner apart from his admissions.  He was caught

6    with two pieces of heroin together weighing approximately 31 grams, scales, a loaded gun,

7    ammunition, and $1,300 in cash.  (1 RT 73-82, 124, 192-94.)  There is no reasonable

8    likelihood that the jury would have reached a different verdict if Petitioner's statements to the

9    deputies had been excluded.  <u>See</u> <u>Ortiz-Sandoval</u>, 323 F.3d at 1170.

10        Accordingly, the state court's rejection of this claim was not contrary to, or an

11   unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).

12   Ground Three does not warrant federal habeas relief.

13   **IV.    <u>GROUND FOUR DOES NOT WARRANT FEDERAL HABEAS RELIEF.</u>**

14        In Ground Four, Petitioner contends that his Fourth, Fifth, and Sixth Amendment

15   rights were violated by the trial court's denial of his motion to suppress the evidence

16   obtained during the traffic stop.  (Petition at 5, Attach. at 23-29.)  Petitioner filed a motion to

17   suppress for lack of probable cause. (CT 43-53.)  There was a hearing, during which Deputy

18   Morovich and Petitioner's investigator testified, and the trial court denied the motion.  (1 RT

19   34.)

20        Petitioner's challenge to the trial court's denial of his motion to suppress arises under

21   the Fourth Amendment.  In <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1975), the United States

22   Supreme Court held that "where the State has provided an opportunity for full and fair

23   litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas

24   corpus relief on the ground that evidence obtained in an unconstitutional search or seizure

25   was introduced at his trial."  In other words, "[a] Fourth Amendment claim is not cognizable

26   in federal habeas proceedings if a petitioner has had a full and fair opportunity to litigate the

27   claim in state court." <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996).  In

28   determining whether a habeas petitioner had a full and fair opportunity to litigate his claim in

1  state court, "[t]he relevant inquiry is whether petitioner had the opportunity to litigate his

2  claim, not whether he did in fact do so or even whether the claim was correctly decided."  Id.

3         California provides criminal defendants with a full and fair opportunity to litigate their

4  Fourth Amendment claims through the procedures of California Penal Code § 1538.5.  See

5  Gordon v. Duran, 895 F.2d 610, 613-14 (9th Cir. 1990).  Petitioner availed himself of this

6  opportunity when he filed his motion to suppress.  Because Petitioner had a full and fair

7  opportunity to pursue his Fourth Amendment claims in state court, he cannot pursue them in

8  this habeas action.  See Stone, 428 U.S. at 494.

9         Accordingly, Ground Four does not warrant federal habeas relief.

10  **V.      GROUND FIVE DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

11         In Ground Five, Petitioner contends that his due process rights were violated when

12  he received a Three Strikes sentence based on prior convictions arising from guilty pleas,

13  because he pleaded guilty on the understanding that the convictions would result in no more

14  than a five year enhancement if he was convicted in the future.  (Petition at 6, Attach. at 29-

15  33.)  There is no evidence before the Court regarding the plea agreements in Petitioner's

16  prior cases.  Assuming that their provisions were as represented by Petitioner, his claim is

17  nevertheless without merit.

18         In general, considerations of fundamental fairness require that "when a plea rests in

19  any significant degree on a promise or agreement of the prosecutor, so that it can be said to

20  be part of the inducement or consideration, such promise must be fulfilled."  Santobello v.

21  New York, 404 U.S. 257, 262 (1971); see also Gunn v. Ignacio, 263 F.3d 965, 969 (9th Cir.

22  2001); United States v. Mondragon, 228 F.3d 978, 980 (9th Cir. 2000).  To determine

23  whether a plea agreement has been broken, courts consider what was "reasonably

24  understood" by a defendant when he entered his plea of guilty.  Gunn, 263 F.3d at 970.

25  "[T]he construction of the plea agreement and the concomitant obligations flowing therefrom

26  are, within broad bounds of reasonableness, matters of state law . . . ."  Ricketts v.

27  Adamson, 483 U.S. 1, 5 n.3 (1987).

28

1       Additionally, the longstanding test for determining the validity of a guilty plea is

2  whether the plea represents a voluntary and intelligent choice among the alternative courses

3  of action open to the defendant.  Hill v. Lockhart, 474 U.S. 52, 56 (1985).  Absent

4  misrepresentations or other impermissible conduct by state agents, a voluntary plea of guilty

5  intelligently made in light of the then applicable law does not become vulnerable because

6  later judicial decision indicate that the plea rested on a faulty premise.  Brady v. United

7  States, 397 U.S. 742, 757 (1970).

8       There is no indication that any promise was breached here.  Contrast Davis v.

9  Woodford, 446 F.3d 957, 961-62 (9th Cir. 2006) (because the prosecutor expressly

10  promised that only one prior conviction would be placed in defendant's criminal record, use

11  of eight counts as eight strikes violated the plea agreement).  The Three Strikes law was

12  enacted in 1994, after Petitioner's 1985 and 1992 guilty pleas.  Petitioner's claim is

13  premised on the view that the plea agreement locked in the sentencing law in effect at the

14  time the agreement was made.  Under California law, however, a plea agreement is

15  "deemed to incorporate and contemplate not only the existing law but the reserve power of

16  the state to amend the law or enact additional laws . . . ."  People v. Gipson, 117 Cal. App.

17  4th 1065, 1070 (2004) (internal quotation marks and citation omitted) (holding that Three

18  Strikes sentence did not violate pre-1994 plea agreement); see also Davis, 446 F.3d at 962

19  (explaining that its conclusion that the plea agreement was breached was consistent with

20  Gipson, because the plea bargain "did not purport to freeze the law" but included a specific

21  promise as to how many prior convictions would be placed in defendant's criminal record).

22  To the extent Petitioner contends that the provision in his plea agreement that in the event

23  of a future conviction he would be subject to a five-year enhancement under Cal. Penal

24  Code § 667 constituted a promise that he would *not* be subject to additional enhancements

25  under future laws, Petitioner could not have reasonably interpreted this provision as a

26  representation that he was forever insulated from future changes in California's sentencing

27  laws.  See Gunn, 263 F.3d at 970; see also Gipson, 117 Cal. App. 4th at 1070 ("Subsequent

28

1    to the plea bargain, the Legislature amended the law; defendant committed another crime;

2    defendant became subject to the penalty described in the amended statute.").

3            Moreover, Petitioner was not entitled to have the trial court advise him of the

4    possibility that the law could change and that his convictions could be used to enhance a

5    future sentence under a not-yet-passed law.  "The possibility that the defendant will be

6    convicted of another offense in the future and will receive an enhanced sentence based on

7    an instant conviction is not a direct consequence of a guilty plea," and a defendant's plea is

8    voluntary even if he is not advised of such collateral consequences.  United States v.

9    Brownlie, 915 F.2d 527, 528 (9th Cir. 1990); see also People v. Crosby, 3 Cal. App. 4th

10   1352, 1354-55 (1992) (possibility of enhanced punishment in case of a future conviction is a

11   collateral consequence of which a defendant need not be advised in connection with a valid

12   guilty plea).

13           For these reasons, Petitioner's Three Strikes sentence does not violate his prior plea

14   agreements and the use of his 1985 and 1992 prior convictions as "strikes" did not violate

15   due process.  Accordingly, the state court's rejection of this claim was not contrary to, or an

16   unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).

17   Ground Five, therefore, does not warrant federal habeas relief.

18   **VI.    GROUND SIX DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

19           In Ground Six, Petitioner contends that his Three Strikes sentence is grossly

20   disproportionate to his crimes, in violation of the Cruel and Unusual Clause of the Eighth

21   Amendment.  (Petition, Attach. at 33-38.)

22           As a general matter, a criminal sentence that is not proportionate to the conviction

23   offense may violate the Eighth Amendment.  Solem v. Helm, 463 U.S. 277, 284 (1983)

24   (sentence of life imprisonment without possibility of parole for seventh nonviolent felony

25   violated Eighth Amendment).  But outside the context of capital punishment, successful

26   challenges to the proportionality of particular sentences are "exceedingly rare."  Id. at

27   289-90 (quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980)).  "The Eighth Amendment

28   does not require strict proportionality between crime and sentence.  Rather, it forbids only

1   extreme sentences that are 'grossly disproportionate' to the crime." Ewing v. California, 538

2   U.S. 11, 23 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J.,

3   concurring)).  If "a threshold comparison of the crime committed and the sentence imposed

4   leads to an inference of gross disproportionality," the reviewing court should compare the

5   sentence with sentences imposed on other criminals in the same jurisdiction and for the

6   same crime in other jurisdictions.  Harmelin, 501 U.S. at 1005.  If a comparison of the crime

7   and the sentence does not give rise to an inference of gross disproportionality, a

8   comparative analysis is unnecessary.  Id.

9        There can be no inference of gross disproportionality here.  In Rummel, the Supreme

10  Court upheld an indeterminate life sentence for a defendant with two prior serious felony

11  convictions who obtained $120.75 by false pretenses.  Rummel, 445 U.S. at 266, 285.  In

12  Harmelin, the Supreme Court did not view as disproportionate a sentence of life without the

13  possibility of parole for a first-time offense of possession of 672 grams of cocaine.

14  Harmelin, 501 U.S. at 996.  In Ewing, the Supreme Court upheld a Three Strikes sentence

15  of 25 years to life for a defendant convicted of grand theft for stealing three golf clubs priced

16  at $400 each, where the defendant had four prior "strike" convictions.  Ewing, 538 U.S. at

17  19, 28-31.  In Andrade, the Supreme Court upheld a Three Strikes sentence of two

18  consecutive terms of 25 years to life for two counts of petty theft with a prior conviction

19  involving $153.54 of videotapes, where the defendant had three prior "strike" convictions.

20  Andrade, 538 U.S. at 66-68, 77.  Petitioner had nine "strike" convictions, and was convicted

21  of possession and transportation of heroin with intent to sell while armed with a loaded

22  revolver, which as an ex-felon he could not legally possess.  If the facts of Rummel,

23  Harmelin, Ewing, and Andrade fell short of the "exceedingly rare" and "extreme" situation

24  where a sentence is grossly disproportionate to the crime, then Petitioner's sentence cannot

25  meet that exacting standard.  Under applicable Supreme Court precedent, its length is within

26  the broad discretion the Constitution allows legislatures to fashion appropriate punishments.

27  See Andrade, 538 U.S. at 76.

28

1    Accordingly, the state court's rejection of Petitioner's Eighth Amendment claim was

2    not contrary to, or an unreasonable application of, clearly established federal law as set

3    forth by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  Ground Six does not

4    warrant federal habeas relief.

5    **VII.    GROUND SEVEN DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

6        In Ground Seven, Petitioner contends that trial counsel was ineffective, in violation

7    of the Sixth Amendment, because she failed to prepare adequately for trial.  (Petition,

8    Attach. at 38-40.)  In his attached declaration, Petitioner sets forth the following instances

9    of deficient representation:  (1) trial counsel did not file a <u>Pitchess</u>[6] motion; (2) she did not

10   investigate the ownership history of the car in which the drugs and gun were found; (3) she

11   did not ask the arresting officer why he searched the engine compartment; (4) she did not

12   investigate possible legitimate sources for the money Petitioner had with him; (5) she did

13   not investigate the inhabitants of the house he visited prior to his arrest to corroborate his

14   claim that he was there for a legitimate purpose; (6) she did not interview Maria  and Jose

15   Lopez, although Petitioner told her that Maria Lopez had admitted placing the drugs and

16   gun in his car; (7) she did not call a forensic witness to testify about a fingerprint analysis

17   favorable to the defense; (8) she rushed to trial, giving Petitioner only a two-day notice of

18   the trial date; (9) she met with Petitioner at the jail only twice and did not adequately

19   communicate with him about trial preparation and tactics; and (10) after Petitioner was

20   convicted, she told him that he was "fucking guilty," and that she had discussed his case

21   with another inmate, who had told her that Petitioner was guilty.  (Petition, Declaration of

22   Steven Bella Perez, dated November 2, 2009 ("Perez Decl.") ¶¶ 4-13.)  In his Traverse,

23   Petitioner also complains that trial counsel did not call an expert witness to testify about

24   false confessions and did not call Deputy Rico to testify that Petitioner never worked for

25   him as an informant.  (Traverse at 16, 17.)

26

27   _____

28      [6]   <u>Pitchess v. Superior Court</u>, 11 Cal.3d 531 (1974).

1    After his conviction, Petitioner successfully moved to substitute counsel pursuant to

2    People v. Marsden, 2 Cal.3d 118 (1970), and his new counsel filed a motion for a new trial

3    on the ground that trial counsel rendered ineffective assistance.  (CT 172, 184-93.)  Trial

4    counsel testified at the hearing on the motion, which was held on November 30, 2007,

5    more than a year after the trial.[7]  (2 RT 443, 447-474.)  The trial court denied the motion,

6    but specifically ruled that the denial did not foreclose Petitioner from seeking state court

7    post-conviction relief based on newly discovered evidence, for instance if Maria Lopez was

8    found and admitted that the drugs were hers.  (2 RT 482.)

9    **A.    Failure to File Pitchess Motion**

10    In Pitchess, 11 Cal.3d at 537-38, the California Supreme Court held that, under

11    certain circumstances, criminal defendants are entitled to discovery of information in a law

12    enforcement officer's personnel file that can assist their defense.  Motions for discovery of

13    police personnel files are called "Pitchess motions."  The defendant must first describe the

14    information sought and show good cause for disclosure, i.e., a specific factual scenario

15    which establishes a plausible factual foundation for the allegations of officer misconduct.

16    California Highway Patrol v. Superior Court, 84 Cal. App. 4th 1010, 1020 (2000).  If the

17    trial court finds good cause, it screens the requested records in camera for relevance.  Id.;

18    see Cal. Penal Code §§ 832.7, 832.8; Cal. Evid. Code §§ 1043–1045.

19    At the hearing on a motion for a new trial, trial counsel testified that she did not

20    think a Pitchess motion seeking Deputy Morovich's personnel records would be

21    meritorious because she did not think the officer was lying about having seen that

22    Petitioner's car had no license plate -- she had re-enacted the scenario with her

23    investigator and found that the license plate or lack of it was generally visible -- and in any

24    event Petitioner did not dispute that his car had no license plate.  (2 RT 457-58.)  The trial

25    court ruled that trial counsel was not ineffective because Petitioner had not shown any

26    basis for a Pitchess motion to be filed in good faith.  (2 RT 480.)

27    _____

28    [7]   Trial counsel's testimony is discussed in connection with the specific ineffective assistance subclaims.

1    Petitioner contends that trial counsel should have filed a <u>Pitchess</u> motion based on

2    information that Deputy Morovich had a history of harassing minorities and conducting

3    traffic stops without probable cause.  (Perez Decl. ¶ 4.)  These unsubstantiated assertions

4    are utterly conclusory and do not set forth a factual scenario constituting good cause for

5    disclosure.  <u>See</u> <u>Warrick v. Superior Court</u>, 35 Cal.4th 1011, 1024 (2005) (to constitute

6    good cause, counsel's declaration in support of <u>Pitchess</u> motion must show how records

7    will support defense to pending charges).  Absent a showing that a <u>Pitchess</u> motion would

8    have been meritorious, counsel did not perform deficiently by failing to file it and Petitioner

9    has not shown prejudice.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 694.

10   **B.    Failure to Investigate**

11   Defense counsel has "a duty to make reasonable investigations or to make a

12   reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466

13   U.S. at 691.  What investigation decisions are reasonable, however, depends in large part

14   on information supplied by the defendant. <u>Id.</u>  "[W]hen a defendant has given counsel

15   reason to believe that pursuing certain investigations would be fruitless or even harmful,

16   counsel's failure to pursue those investigations may not later be challenged as

17   unreasonable." <u>Id.</u>  Thus, "inquiry into counsel's conversations with the defendant may be

18   critical to a proper assessment of counsel's investigation decisions." <u>Id.</u>

19   Moreover, to establish prejudice based on failure to investigate, there must be

20   evidence showing what significant and favorable evidence an adequate investigation

21   would have yielded.  <u>See</u> <u>Hendricks v. Calderon</u>, 70 F.3d 1032, 1042 (9th Cir. 1995);

22   <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994); <u>see</u> <u>generally</u> <u>Mickey v. Ayers</u>, 606 F.3d

23   1223, 1236–37 (9th Cir. 2010), <u>cert.</u> <u>denied</u>, 132 S. Ct. 419 (2011) ("[W]ith respect to

24   defective investigations, the test for prejudice is whether the noninvestigated evidence was

25   powerful enough to establish a probability that a reasonable attorney would decide to

26   present it and a probability that such presentation might undermine the jury verdict.").

27   Petitioner contends that trial counsel failed to investigate the ownership history of

28   the Firebird to explain the presence of drugs in the car.  (Perez Decl. ¶ 5.)  The car was

1   registered to Luis Gonzales of Thermal, California.  (1 RT 83-84.)  Trial counsel testified
2   that she and her investigator obtained a D.M.V. history of the car.  (2 RT 461.)  Petitioner
3   initially told her that he had borrowed the car from a man called Daniel Gonzalez in Blythe;
4   later he told her that he had bought the car from a man called Daniel whose last name or
5   address he did not know.  (2 RT 461-62, 464.)  She did not try to contact Luis Gonzalez,
6   whose name was on the pink slip, because Petitioner told her and her investigator that he
7   did not know who Luis Gonzalez was; it was only during the trial that he told her that he
8   had learned that Luis Gonzalez was Daniel's cousin.  (2 RT 465.)  At trial, Deputy
9   Morovich testified that Petitioner told him that he got the car and heroin from two brothers
10  in Thermal and was going to sell the heroin to make money for his father's funeral, while
11  Petitioner testified that Daniel Gonzales in Thermal had sold the car to him and he was
12  going to resell it.  (1 RT 85-86, 117; 2 RT 278-83.)

13      Petitioner has not shown prejudice.  Petitioner admitted knowledge of the heroin
14  and gun to Deputy Morovich and told him that he got the car and the heroin from the same
15  source.  (1 RT 85-86, 117.)  Thus, evidence linking Luis Gonzalez and his car to drugs
16  would not have exculpated Petitioner.  There is no reasonable likelihood that further
17  investigation of the ownership of the car would have yielded helpful evidence, or made a
18  difference to the result of the trial.  Strickland 466 U.S. at 694.

19      Petitioner complains that trial counsel did not investigate possible legitimate
20  sources of the cash he had with him or subpoena his bank records, in order to rebut the
21  prosecution theory that the money was from drug sales.  (Perez Decl. ¶ 7.)  Significantly,
22  Petitioner does not state in his declaration where he got the money or what he told trial
23  counsel about its source.  At the hearing on the motion for a new trial, trial counsel was
24  asked whether she had contacted Petitioner's employer to explain the money Petitioner
25  had with him.  She responded that she had not, because Petitioner had originally told her
26  that he had done some work for a neighbor and had recently cashed a large check at the
27  Bank of America.  (2 RT 462.)  When she pressed him for the name of the neighbor or the
28  location of the Bank of America branch, he told her that the money did not come from a

1    single source and that he had been saving it up from doing odd jobs.  (<u>Id.</u>)  At that point,

2    trial counsel decided not to pursue the matter further.  (<u>Id.</u>)  Given Petitioner's changing

3    stories, trial counsel reasonably decided that further investigation would be fruitless, if not

4    harmful.  <u>See</u> <u>Strickland</u>, 466 U.S. at 691.  She presented testimony from Petitioner's

5    fiancée that on the day of the arrest he had taken with him $1,500 in cash, collected in part

6    from his family, to make a deposit on his father's funeral.  (1 RT 218-19, 234.)  In any

7    event, Petitioner has not shown that further investigation would have yielded helpful

8    information; in fact, he pointedly avoids explaining where he got the money.  Thus, he has

9    not shown prejudice.  <u>Strickland</u>, 466 U.S. at 694.

10         Petitioner contends that trial counsel failed to investigate the inhabitants of the

11    house he had visited just before his arrest in order to corroborate his claim that he was

12    there for a legitimate purpose.  (Perez Decl. ¶ 8.)  At the hearing on the motion for a new

13    trial, trial counsel testified that she and her investigator unsuccessfully attempted to

14    contact the owner of the house, which had gone into foreclosure.  They discovered that

15    the woman living in the house was in jail and they did not have her last name because the

16    house actually belonged to another family member.  (2 RT 450.)  In any case, Petitioner

17    has not come forth with evidence that the inhabitants of the house would have

18    corroborated his story that he was there to sell his car.  Thus, Petitioner has not shown

19    prejudice.  <u>See</u> <u>Dows v. Wood</u>, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective

20    assistance claim based on failure to interview or call alibi witness when no declaration

21    from witness that would have provided helpful testimony).

22         In a related claim, Petitioner contends that trial counsel refused to interview Maria

23    and Joe Lopez, who rented a room at the house.  (Perez Decl. ¶ 9.)  Petitioner contends

24    that Maria Lopez put the drugs and gun in the engine compartment without his knowledge,

25    and had confessed to doing so.  (Perez Decl. ¶ 9; Traverse at 16.)  He has attached to the

26    Petition a letter dated August 1, 2007, from Lupe Navarro -- another witness whom

27    Petitioner contends trial counsel should have interviewed -- stating that she heard Maria

28    Lopez say that she was sorry that she put the drugs and gun in the engine, and that she

1   would testify for Petitioner and admit that she put the drugs and gun there.  (Petition,

2   Exhs.)  Petitioner asserts that, two weeks after his arrest, Maria and Joe Lopez were

3   arrested for drug offenses and pleaded guilty.  (Perez Decl. ¶ 9; Traverse at 16.)

4          Trial counsel testified that Petitioner had told her that "Mary Lopez" was looking at

5   his car while he was speaking to someone else by the front door, and that he thought she

6   might have placed the drugs under the hood.  (2 RT 451.)  After he told her that Lopez

7   was in custody, she tried to find Lopez but could not locate a current criminal case against

8   "Mary Lopez" or a Riverside County jail inmate by that name.  (Id. at 452.)  Petitioner did

9   not tell her that Lopez's name was actually Maria, though apparently her investigator knew

10  the correct name.  (Id. at 453-54.)  She did not think that Joe Lopez would have useful

11  information, and Petitioner never told her about Lupe Navarro.  (Id. at 455.)  In making its

12  ruling, the trial court noted that there was no evidence before it that Maria Lopez would

13  actually testify that she put the drugs in the car, and that Petitioner could attempt to obtain

14  such evidence for future attacks on his conviction.  (Id. at 482.)

15         Petitioner, however, has not submitted a declaration by Maria Lopez stating that she

16  would have testified that she placed the drugs and gun in the Firebird engine.  Nor has he

17  submitted a declaration by Joe Lopez or Lupe Navarro or any person who saw Maria Lopez

18  place the drugs and gun in the engine or, for that matter , explained how she was able to

19  do so without Petitioner noticing.  Thus, even assuming that trial counsel's attempts to

20  locate Lopez were deficient, Petitioner has not shown prejudice.  See Dows, 211 F.3d at

21  486.

22         **C.     Inadequate Cross-Examination; Failure to Call Witnesses**

23         Petitioner contends that trial counsel failed to ask the arresting officer why he

24  searched the engine compartment when the basis for the traffic stop was traffic violations.

25  (Perez Decl. ¶ 6.)  By the time Deputy Morovich searched the engine, he had ascertained

26  that Petitioner was driving with a suspended driver's license and had a suspiciously large

27  amount of cash on him.  (1 RT 72-74.)  There was probable cause for an inventory search

28  of the car, and Petitioner does not explain how this line of inquiry would have benefited him.

He has shown neither deficient performance nor prejudice.  Strickland, 466 U.S. at 687, 694.

Petitioner complains that trial counsel did not call a forensic technician to testify regarding a fingerprint analysis that was favorable to the defense.  (Perez Decl. ¶ 10.)  The parties stipulated at trial that the forensic technician who examined the gun, bullets, bags with heroin, and drug paraphernalia for fingerprints would testify that she was unable to lift any comparable latent prints from the items.  (1 RT 206.)  At the hearing on the motion for a new trial, trial counsel testified that she did not call the forensic technician to the stand because the fingerprints lifted were non-comparable.  (2 RT 460.)  She also testified that she entered into the stipulation in order to preclude the forensic technician from saying on the stand that the fact that the fingerprints were non-comparable did not rule out the possibility that they were Petitioner's.  (Id.)  At closing argument, trial counsel stressed that there were no fingerprints linking Petitioner to the drugs and gun.  (2 RT 372.)  Thus, trial counsel had a valid strategic reason for stipulating to the results rather than calling the forensic technician to the stand.  Petitioner has shown neither deficient performance nor prejudice.  Strickland, 466 U.S. at 687, 694.

Petitioner contends that trial counsel was ineffective because she did not call an expert to testify regarding false confessions.  (Traverse at 16.)  Petitioner has not shown prejudice from counsel's failure to contact an expert because he has not provided a declaration setting forth the substance of the expert's expected testimony.  See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir.1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").

In his Traverse, Petitioner contends that trial counsel should have called Deputy Rico to the stand, because Rico would have testified that Petitioner never worked as an informant for him, thus impeaching Deputy Morovich, who testified that Petitioner had told him that he worked as an informant for Rico.  (Traverse at 17.)  At trial counsel's request, Morovich's testimony regarding Rico was struck and the jury was instructed to disregard it.  (RT 87-89.)  While the prosecutor later elicited testimony that Morovich contacted Rico (1

1   RT 91), there was no testimony before the jury that Petitioner worked for Rico as an

2   informant.  Thus, there was nothing to impeach and no ineffective assistance.

3         **D.      "Rush to Trial"; Inadequate Communication; Discussing Case with**

4                  **Another Client**

5         Petitioner complains that trial counsel rushed to trial and provided him with only a

6   two-day notice of the trial date.  (Perez Decl. ¶ 11.)  The felony complaint against Petitioner

7   was filed on November 21, 2005, and trial commenced on September 18, 2006.  (CT 1,

8   72.)  This was a straightforward case and ten months hardly constituted a "rush to trial."

9   Moreover, trial tactics, including the determination of whether the defense is ready for trial,

10  are committed to the discretion of counsel.  See United States v. Corona-Garcia, 210 F.3d

11  973, 977n.2 (9th Cir. 2000).  The Court also notes that Petitioner did not testify until

12  September 21, 2006, three days after the trial started.  (CT 85.)

13        Petitioner also contends that trial counsel did not adequately communicate with him

14  regarding trial preparation and tactics.  (Perez Decl. ¶ 12.)  He declares that she only

15  visited him in jail twice for short periods, and that she told him that she was too tired to

16  discuss the case and that he should just trust her.  (Id.)  At the hearing, trial counsel

17  testified that she went to the jail twice before the motion to suppress because Petitioner

18  was giving her different information each time.  (2 RT 455.)  She also saw Petitioner the

19  Friday before trial started and told him that she was too tired to talk because she had just

20  finished trial, but that she would return during the weekend.  (Id. at 455-56.)  She returned

21  on Saturday and spent several hours at the jail with Petitioner.  (Id.)  She denied that she

22  ever told him that he should just trust her.  (Id. at 456.)

23        "Adequate consultation between attorney and client is an essential element of

24  competent representation of a criminal defendant."  Summerlin v. Schriro, 427 F.3d 623,

25  633 (9th Cir. 2005) (quoting United States v. Tucker, 716 F.2d 576, 581 (9th Cir. 1983)).

26  "While the amount of consultation required will depend on the facts of each case, the

27  consultation should be sufficient to determine all legally relevant information known to the

28  defendant."  Tucker, 716 F.2d at 581-82.  "[T]here is no established minimum number of

1   meetings between counsel and client prior to trial necessary to prepare an attorney to

2   provide effective assistance of counsel."  Moody v. Polk, 408 F.3d 141, 148 (4th Cir. 2005)

3   (internal quotation marks and citation omitted).  Petitioner does not specify what material

4   information he was unable to divulge to trial counsel, nor does he set forth any facts that

5   would support a finding that trial counsel's failure to meet with him more often negatively

6   impacted the outcome of his trial. Thus, Petitioner has not shown that he was prejudiced by

7   the purportedly inadequate consultation.  See United States v. Mealy, 851 F.2d 890,

8   908-09 (7th Cir. 1988) ("[Defendant] fails to explain how the lack of consultation affected

9   the outcome of the trial.  [Defendant's] conclusory allegations regarding the time spent in

10  consultation with his trial counsel do not show that he was prejudiced at trial, and thus his

11  ineffective assistance of counsel claim must fail.").

12      Finally, Petitioner complains that after his conviction, trial counsel told him, using

13  profanity, that he was guilty, and said that another of her clients, who was an inmate at the

14  same jail, had told her so.  (Perez Decl. ¶ 13.)  At the hearing on a motion for a new trial,

15  trial counsel denied that she had told Petitioner that she knew that he was guilty, or that

16  she had discussed his case with another client.  (2 RT 457.)  She testified that she had told

17  Petitioner not to discuss his case with other inmates, because she was approached by an

18  inmate who told her that she needed to stop Petitioner from talking because he had

19  overheard him boasting that he had almost gotten away with the crime.  (2 RT 457-558.)

20  Regardless, trial counsel's actions cannot be a basis for an ineffective assistance claim

21  because Petitioner had already been convicted and she did not represent Petitioner during

22  his post-trial motions or at sentencing.

23                          ************************

24      Accordingly, the state court's rejection of Petitioner's ineffective assistance claims

25  was not contrary to, or an unreasonable application of, clearly established federal law.  28

26  U.S.C. § 2254(d)(1).  Ground Seven does not warrant federal habeas relief.

27

28

1   **VIII.   PETITIONER IS NOT ENTITLED TO AN EVIDENTIARY HEARING.**

2          Petitioner seeks an evidentiary hearing.  (Traverse at 18.)  The Supreme Court has

3   held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that

4   was before the state court that adjudicated the claim on the merits."  Cullen v. Pinholster,

5   __ U.S. __, 131 S. Ct. 1388, 1398 (2011).  Moreover, an evidentiary hearing is not

6   warranted where, as here, "the record refutes the applicant's factual allegations or

7   otherwise precludes habeas relief."  Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

8   Accordingly, Petitioner's request for an evidentiary hearing is denied.

9                                          **ORDER**

10          Petitioner is not entitled to relief on the claims in his Petition.

11          Accordingly, IT IS HEREBY ORDERED that the Petition is denied, and Judgment

12   shall be entered dismissing this action with prejudice.

13

14   DATED: <u>September 7, 2012</u>                    <u>        */s/John E. McDermott*        </u>

15                                                                 JOHN E. MCDERMOTT
                                                                   UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28